| | |
|---|---|
| JANE DOE,<br>c/o Jeckering & Associates, LLC<br>10 N. High St., Suite 301<br>Columbus, OH 43215,<br><br>          Plaintiff,<br>v.<br><br>CITY OF COLUMBUS,<br>c/o Columbus City Attorney's Office<br>77 North Front Street<br>Columbus, OH 43215,<br><br>and<br><br>FRANKLIN COUNTY, OHIO,<br>c/o Franklin County Prosecuting Attorney<br>373 South High Street, 14th Floor<br>Columbus, OH 43215,<br><br>and<br><br>ANTHONY SHINAUL,<br>1391 Kenwick Rd.<br>Columbus, OH 43209,<br><br>and<br><br>JOHN DOE #1 (CPD detective—report author),<br>and JOHN DOE #2 (CPD detective—testifying<br>officer), in their individual capacities,<br><br>and<br><br>JOHN/JANE DOES #3–7 (FCPO personnel<br>responsible for public disclosure of Plaintiff's<br>identifying information), in their individual capacities,<br><br>and<br><br>JOHN/JANE DOES #8–12, in their individual<br>capacities,<br><br>          Defendants. | Case No. 2:26-cv-684<br><br>Judge:<br><br>**COMPLAINT**<br><br>**JURY DEMAND ENDORSED<br>HEREIN** |

**COMPLAINT**

In July 1994 a stranger broke into Plaintiff's home and raped her in front of her infant child. She gave the Columbus Division of Police a description specific enough to solve the case in weeks—a muscular Black man, a married neighbor known as "Tony," with an overweight wife, who had knocked on her door the night before. The police did nothing with it for three decades. A detective instead wrote into the file that Plaintiff had "drinks" with the man the night before he raped her—words she never spoke and something that never happened—recasting a stranger's home invasion as an evening she had invited. The state court that dismissed the prosecution thirty-one years later found that a neighborhood canvass would have closed the case in weeks, not decades, and condemned the government's "set it and forget it" approach. This action seeks redress for three wrongs: that officers fabricated a record portraying Plaintiff as complicit in her own rape; that the State, on the basis of her sex, afforded her far less protection than it gives other crime victims; and that the County publicly exposed her identity as a rape victim while her assailant remained free. Plaintiff alleges as follows:

<u>**PARTIES**</u>

1. Plaintiff Jane Doe is an adult resident of Fairfield County, Ohio.

2. In July 1994, Plaintiff was the victim of a violent home-invasion rape committed in the presence of her infant child.

3. Plaintiff proceeds under pseudonym to protect her safety and privacy as a sexual-assault survivor.

4. Plaintiff has moved separately for leave to proceed under pseudonym.

5. Defendant City of Columbus is an Ohio municipal corporation.

6. The City is responsible for the policies, practices, training, supervision, and discipline of the Columbus Division of Police.

7. Defendant Franklin County, Ohio, is a political subdivision of the State of Ohio.

8. The County maintains the Franklin County Prosecuting Attorney's Office.

9. The claims against the County concern its administrative handling and public release of victim-identifying information, not any prosecutorial charging decision.

10. Defendant Anthony Shinaul is an adult resident of Ohio.

11. Shinaul committed aggravated burglary, kidnapping, and rape against Plaintiff in July 1994.

12. Shinaul was identified decades later through DNA evidence.

13. Defendant John Doe #1 is the CPD detective who authored or caused to be entered into the 1994 investigative file, the false statement that Plaintiff had "drinks with 'Tony' the night before she was assaulted."

14. John Doe #1 is sued in his individual capacity.

15. Defendant John Doe #2 is the CPD detective who later adopted and perpetuated that false statement as a record fact in the investigative file and case record.

16. John Doe #2 is sued in his individual capacity.

17. The true identities of John Does #1 and #2 are presently known only to Defendants and are not reasonably ascertainable by Plaintiff without discovery.

18. Plaintiff will substitute their true names upon discovery.

19. Defendants John/Jane Does #3–7 are presently unidentified FCPO employees, agents, or contractors who caused Plaintiff's identifying information to be publicly disclosed.

20. John/Jane Does #3–7 acted in an administrative and ministerial capacity.

21. John/Jane Does #3–7 are sued in their individual capacities.

22. Plaintiff has exercised diligence to identify John/Jane Does #3–7 and will substitute their true names upon discovery.

23. Defendants John/Jane Does #8–12 are presently unidentified City or County employees, agents, or policymakers who participated in, directed, or ratified the conduct alleged herein.

24. John/Jane Does #8–12 are sued in their individual capacities.

## JURISDICTION AND VENUE

25. This Court has federal-question jurisdiction under 28 U.S.C. § 1331 over Plaintiff's claims under 42 U.S.C. § 1983 and the Fourteenth Amendment.

26. This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Plaintiff's related Ohio-law claims.

27. Plaintiff's Ohio-law claims arise from the same case or controversy as her federal claims.

28. Venue is proper under 28 U.S.C. § 1391(b).

29. A substantial part of the events or omissions giving rise to the claims occurred in this District.

30. One or more Defendants reside in this District.

## FACTUAL ALLEGATIONS

### The 1994 rape and Plaintiff's actionable description of her attacker.

31. In July 1994, an intruder broke into Plaintiff's home.

32. The intruder violently raped Plaintiff in the presence of her infant child.

33. The night before the assault, a man knocked on Plaintiff's door.

34. The man introduced himself as "Tony."

35. The man said he was Plaintiff's neighbor.

36. The man said he wanted to meet Plaintiff.

37. That was the first and only time Plaintiff had seen the man before the attack.

38. Plaintiff did not know the man.

39. Plaintiff had never socialized with the man.

40. Plaintiff had never had drinks with the man.

41. During the attack, the assailant stated that he had a three-month-old daughter.

42. During the attack, the assailant stated that he had an overweight wife.

43. During the attack, the assailant stated that he had been watching Plaintiff through her windows.

44. Plaintiff told the police that her attacker was a muscular Black male.

45. Plaintiff told the police that her attacker was a neighbor known as "Tony."

46. Plaintiff told the police that her attacker was married to an overweight woman.

47. Plaintiff told the police that her attacker lived nearby.

48. Plaintiff told the police how she was able to identify her attacker.

49. Plaintiff did not tell the police that she knew her attacker.

50. Biological evidence was collected from the scene.

51. The biological evidence was preserved.

### The fabricated "drinks" entry.

52. The 1994 investigative file is a compilation of reports, notes, and evidence.

53. Within that file, Defendant John Doe #1 created an entry stating that Plaintiff had "drinks with 'Tony' the night before she was assaulted."

54. That statement was false when it was written.

55. Plaintiff never told any officer that she had drinks with her attacker.

56. Plaintiff never told any officer that she had socialized with her attacker.

57. Plaintiff never told any officer that she previously knew her attacker.

58. The statement did not summarize anything Plaintiff said.

59. John Doe #1 manufactured the statement.

60. The statement recast a stranger's home invasion as a social encounter between acquaintances.

61. The statement carried the implication that Plaintiff had invited the encounter.

62. The statement furnished a pretext to treat Plaintiff's case as low priority.

63. Defendant John Doe #2 thereafter adopted the false statement and carried it forward as a purported record fact in the investigative file and in the handling of Plaintiff's case.

64. John Doe #2 treated the statement as an established record fact in the course of the investigation.

65. John Doe #2 knew the statement was false.

66. The September 29, 2025, dismissal entry records that the file indicated Plaintiff had "drinks with 'Tony.'" (Ex. A.)

67. The fabricated entry survived in the investigative file and remained in the case record.

**The disparate, sex-based denial of investigation.**

68. Plaintiff's description identified her attacker as a married neighbor named "Tony" living in close proximity.

69. The police conducted no neighborhood canvass.

70. The police never interviewed the neighbor known as "Tony."

71. The police never sought a comparison sample from that neighbor.

72. The police left the biological evidence untested for approximately fourteen years.

73. A DNA profile was generated from the biological evidence in or about 2008.

74. The man Plaintiff had described lived near her throughout that period.

75. The State did not amend the indictment to name Shinaul until June 11, 2024. (Ex. A.)

76. On September 29, 2025, the Franklin County Court of Common Pleas dismissed the indictment.

77. The court found that the State failed to exercise reasonable diligence. (Ex. A.)

78. The court found that a neighborhood canvass based on Plaintiff's description would have closed the investigation in weeks, not decades. (Ex. A.)

79. The court characterized the government's approach as "set it and forget it." (Ex. A.)

**The public disclosure of Plaintiff's identity.**

80. Plaintiff was in regular contact with FCPO Victim Advocate Rachel Gangwer by text message between July 2024 and June 2025 concerning the criminal case. (Ex. B.)

81. On or about the time of the proceedings that led to dismissal, Defendants John/Jane Does #3–7 caused Plaintiff's identifying information to be publicly disclosed.

82. The disclosed information connected Plaintiff by name to her status as the victim of the 1994 rape.

83. The information was made publicly accessible by Defendants on after the dismissal.

84. The information was removed only after Plaintiff personally demanded its removal.

85. The disclosure was not made in connection with any advocacy or judicial-phase function of the Prosecuting Attorney.

86. The disclosure was performed by administrative, public-information, or records personnel.

87. The disclosure was performed in an administrative and ministerial capacity.

88. The disclosure occurred outside any court filing or proceeding.

89. At the time of the disclosure, Plaintiff's assailant had not been apprehended.

90. At the time of the disclosure, Plaintiff's assailant remained at liberty.

91. Plaintiff's assailant had told her during the assault that he had been watching her through her windows.

92. Publicly connecting Plaintiff's name to the case exposed her to a concrete risk of being located by her assailant.

93. R.C. 2930.07 provides that a victim's identifying information is not, absent consent, a matter for public release.

### Discovery of the claims, concealment, and accrual.

94. Plaintiff did not learn the identity of her assailant until approximately June 2024.

95. Plaintiff did not learn of the fabricated entry until on or about September 29, 2025.

96. Plaintiff did not learn of the public disclosure of her identity until on or about September 29, 2025.

97. Plaintiff could not, in the exercise of reasonable diligence, have discovered these facts at any earlier date.

98. Plaintiff had no access to the 1994 investigative file at any time before the criminal proceedings concluded.

99. Plaintiff had no reason to suspect that any officer had entered into that file a false statement attributing to her a social encounter with her attacker.

100. The fabricated entry supplied a facially neutral pretext for the low priority given Plaintiff's case and thereby concealed the sex-based denial of investigation.

101. By recording Plaintiff as a willing participant in the crime committed against her, Defendants obscured both the fabrication and the discriminatory basis for the abandonment of her case.

102. Plaintiff knew that her case had not been solved, but neither knew nor, in the exercise of reasonable diligence, could have known that the inaction rested on her sex or on a fabricated record, until on or about September 29, 2025. (Ex. A.)

103. The constitutional injuries alleged in Counts I and II were therefore not discoverable by Plaintiff until on or about September 29, 2025.

104. John Doe #1 affirmatively concealed Plaintiff's claims by creating the false entry, a contrivance designed to exclude suspicion and prevent inquiry into the basis for the abandonment of her case.

105. John Doe #2 affirmatively concealed Plaintiff's claims by adopting and perpetuating the false entry as a record fact.

106. The City affirmatively concealed Plaintiff's claims by maintaining the false entry in an investigative file to which Plaintiff had no access.

107. Each of these affirmative acts of concealment was designed to prevent discovery of Plaintiff's claims, and each of these Defendants is estopped from asserting any limitations defense to Counts I and II.

108. In the alternative, the denial of investigation was a continuing course of conduct that did not cease until the State identified Shinaul and dismissed the indictment.

109. Plaintiff's claims in Counts I and II accrued no earlier than September 29, 2025.

## COUNT I

### 42 U.S.C. § 1983 — Equal Protection, Fourteenth Amendment
### (Sex Discrimination in the Provision of Police Protection)
### (Against John Doe #1, John Doe #2, the City, and the County)

110. Plaintiff realleges each preceding paragraph as if fully rewritten herein.

111. At all relevant times, John Doe #1 acted under color of state law.

112. At all relevant times, John Doe #2 acted under color of state law.

113. At all relevant times, the policymaking officials of the City and the County acted under color of state law.

114. Section 1983 affords Plaintiff a cause of action against any person who, acting under color of state law, deprived her of a right secured by the Constitution and laws of the United States.

115. The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution secured to Plaintiff the right not to be denied the equal protection of the laws on account of her sex, including the right not to be afforded materially less police investigation and protection than the City and the County afford persons similarly situated who are not women reporting a sexual assault.

116. Plaintiff is a woman.

117. Plaintiff reported to the City's police that she had been raped.

118. The City and the County investigate non-sexual crimes against the home, including burglaries, robberies, and assaults.

119. In investigating such crimes, the City's police canvass the neighborhood where the crime occurred.

120. In investigating such crimes, the City's police interview named suspects.

121. In investigating such crimes, the City's police obtain comparison evidence from identified suspects.

122. When the victim of such a crime provides police the offender's name, description, and approximate location, the police pursue that lead.

123. Plaintiff provided the police the first name by which her attacker was known.

124. Plaintiff provided the police a detailed physical description of her attacker.

125. Plaintiff provided the police the fact that her attacker was married to an overweight woman.

126. Plaintiff provided the police the fact that her attacker lived in her neighborhood.

127. That information was sufficient to identify Plaintiff's attacker within weeks.

128. The police conducted no neighborhood canvass.

129. The police never interviewed the neighbor known as "Tony."

130. The police never sought a comparison sample from that neighbor.

131. The police left the biological evidence untested for approximately fourteen years.

132. On information and belief, the City and the County afford women who report sexual assault less investigative effort than they afford victims of other violent crimes presenting equivalent leads.

133. On information and belief, the City and the County afford women who report sexual assault less protection than they afford victims of other violent crimes presenting equivalent leads.

134. On information and belief, that disparity reflects a custom or policy of the City and the County, manifested in a persistent and widespread practice and pattern.

135. A detective of the City wrote into the investigative file that Plaintiff had "drinks with 'Tony' the night before she was assaulted."

136. Plaintiff never made that statement to any officer.

137. That statement was false when it was written.

138. That statement recast a stranger's home invasion as a social encounter the victim had invited.

139. That statement recorded the premise that a woman raped by a man she had supposedly entertained was complicit in her own assault.

140. John Doe #1 manufactured that statement because Plaintiff was a woman who reported a sexual assault.

141. John Doe #2 carried that false statement forward in the investigative file as though it were a record fact.

142. John Doe #2 did so with knowledge of its falsity.

143. The City and the County, through their custom or policy and their practice and pattern, treated Plaintiff as less credible and less deserving of police protection because she was a woman who reported a sexual assault.

144. A case capable of resolution within weeks instead lay dormant for approximately thirty years.

145. No legitimate law-enforcement purpose explains that result.

146. Here, John Doe #1, John Doe #2, the City, and the County, acting under color of state law, deprived Plaintiff of the equal protection of the laws guaranteed by the Fourteenth Amendment by affording her, because she is a woman who reported a sexual assault, materially less investigation and protection than they afford victims of comparable crimes who present equivalent leads, and by fabricating and adopting a record portraying her as complicit in the crime committed against her.

147. As a direct and proximate result of the discrimination, Plaintiff's rapist remained unidentified and at liberty for approximately thirty years.

148. During those years, Plaintiff lived with the knowledge that the man who raped her in her home had never been pursued and could return.

149. The State recorded Plaintiff, in its own files, as a willing participant in the crime committed against her.

150. The State made that falsehood the working justification for abandoning her case.

151. Plaintiff has suffered the indignity of being recorded by her government as complicit in her own rape.

152. Plaintiff has suffered the compounded trauma of learning, decades later, that this was the reason her case was abandoned.

153. As a direct and proximate result of Defendants' conduct, Plaintiff was damaged, including by the denial of any meaningful investigation of the crimes against her, the prolonged liberty of her assailant, the recording of Plaintiff by her government as a willing participant in her own rape, and severe emotional distress.

## COUNT II

**42 U.S.C. § 1983 — Equal Protection, Fourteenth Amendment**
**(Fabrication of a False Investigative Record)**
**(Against John Doe #1 and John Doe #2, in their individual capacities)**

154. Plaintiff realleges each preceding paragraph as if fully rewritten herein.

155. At all relevant times, John Doe #1 acted under color of state law.

156. At all relevant times, John Doe #2 acted under color of state law.

157. Section 1983 affords Plaintiff a cause of action against any person who, acting under color of state law, deprived her of a right secured by the Constitution and laws of the United States.

158. The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution secured to Plaintiff the right not to have the State manufacture a false record portraying her, because she is a woman who reported a sexual assault, as complicit in the crime committed against her, and not to be denied the equal protection of the laws on that basis.

159. John Doe #1 created the false "drinks" entry in the investigative file in 1994.

160. John Doe #1 created that entry in the course of investigating the crimes against Plaintiff.

161. Creating that entry was an investigatory act.

162. Creating that entry was not testimony.

163. John Doe #1 knew the entry was false when he created it.

164. John Doe #1 created the false entry pursuant to and consistent with the practice and pattern of the City of treating women who report sexual assault as less credible and less deserving of police protection than other crime victims.

165. John Doe #2 thereafter adopted and perpetuated the false entry as a record fact in the investigative file and case record.

166. John Doe #2's adoption and perpetuation of the false entry was an investigatory and administrative act.

167. It was not testimony given as a witness in a judicial proceeding.

168. John Doe #2 knew the entry was false.

169. The fabrication branded Plaintiff a woman who invited the encounter that ended in her rape.

170. The fabrication operated to justify denying Plaintiff the investigation afforded other victims.

171. The fabrication deprived Plaintiff of the equal protection of the laws.

172. Here, John Doe #1 and John Doe #2, acting under color of state law, deprived Plaintiff of the equal protection of the laws by creating and maintaining within the investigative file a false record portraying Plaintiff as complicit in her own rape.

173. As a direct and proximate result of the fabrication, Plaintiff's case was deprioritized and abandoned.

174. As a direct and proximate result of the fabrication, Plaintiff was recorded by her government as complicit in her own rape.

175. Plaintiff has suffered severe emotional distress and dignitary injury from being branded a participant in the crime committed against her.

176. As a direct and proximate result of Defendants' conduct, Plaintiff was damaged, including by the abandonment of the investigation of her rape, the recording of Plaintiff by her government as complicit in the crime committed against her, and severe emotional distress.

## COUNT III

### 42 U.S.C. § 1983 — Fourteenth Amendment Right to Informational Privacy
### (Against John/Jane Does #3–7, in their individual capacities)

177. Plaintiff realleges each preceding paragraph as if fully rewritten herein.

178. At all relevant times, John/Jane Does #3–7 acted under color of state law.

179. Plaintiff's identity as the victim of a violent home-invasion rape is information of an intimate and sexual nature.

180. Plaintiff held a substantial interest in not having that information publicly disclosed.

181. John/Jane Does #3–7 publicly disclosed that information.

182. They disclosed it without Plaintiff's consent.

183. They disclosed it without any legitimate governmental purpose.

184. They disclosed it without narrow tailoring to any compelling interest.

185. At the time of the disclosure, Plaintiff's assailant remained at liberty.

186. The disclosure exposed Plaintiff to a concrete risk of being located by her assailant.

187. The risk of harm from the disclosure was obvious and foreseeable.

188. John/Jane Does #3–7 acted with deliberate indifference to that risk.

189. As a direct and proximate result of the disclosure, Plaintiff suffered renewed fear for her physical safety.

190. As a direct and proximate result of the disclosure, Plaintiff suffered stigma and a heightened risk of harassment.

191. As a direct and proximate result of the disclosure, Plaintiff suffered severe emotional distress and loss of personal security.

## COUNT IV

**42 U.S.C. § 1983 — Municipal Liability (Monell)**
**(Deprivation of Fourteenth Amendment Rights to**
**Equal Protection and Informational Privacy)**
**(Against the City and the County)**

192. Plaintiff realleges each preceding paragraph as if fully rewritten herein.

193. This Count concerns the administrative functions of the City and the County.

194. This Count does not concern any prosecutorial charging function.

195. The City and the County are persons subject to suit under Section 1983, and each is liable where its custom or policy is the moving force behind the deprivation of a right secured by the Constitution.

196. This Count is grounded in two rights secured to Plaintiff by the Fourteenth Amendment: the right to the equal protection of the laws, as alleged in Count I, and the right to informational privacy against the gratuitous public disclosure of her identity and the intimate details of her rape, as alleged in Count III.

197. As against the City, this Count rests on the deprivation of Plaintiff's right to the equal protection of the laws. As against the County, this Count rests on the deprivation of Plaintiff's rights to the equal protection of the laws and to informational privacy.

198. The City maintained a custom or policy, manifested in a persistent and widespread practice and pattern, of affording female sexual-assault victims less protection than victims of comparable crimes.

199. The County maintained a custom or policy, manifested in a persistent and widespread practice and pattern, of affording female sexual-assault victims less protection than victims of comparable crimes.

200. The County maintained a custom or policy, manifested in a persistent and widespread practice and pattern, of failing to safeguard sexual-assault victims' identifying information against public release.

201. The City failed to train and supervise the personnel responsible for investigating sexual-assault cases.

202. The County failed to train and supervise the personnel responsible for handling victim-identifying information.

203. The need for such training and supervision was obvious.

204. The City and the County were deliberately indifferent to that need.

205. The City's and the County's policymakers continued to adhere to an approach to sexual-assault investigation and victim-information handling that they knew or should have known had failed to prevent constitutional violations.

206. A final policymaker for the County learned of the public disclosure of Plaintiff's identity.

207. That policymaker failed to take any corrective or disciplinary action regarding the disclosure.

208. That failure ratified the disclosure.

210. This practice and pattern, together with the failures to train and supervise alleged herein, was so persistent and widespread as to constitute the custom and policy of the City and the County, and was the moving force behind the deprivation of Plaintiff's rights under the Equal Protection Clause of the Fourteenth Amendment and to informational privacy alleged in Counts I and III.

211. As a direct and proximate result of the City's and the County's practice and pattern and their deliberate indifference, Plaintiff was damaged, including by the prolonged denial of investigation and police protection, the public exposure of her identity as the victim of a violent rape while her assailant remained at liberty, renewed fear for her physical safety, stigma, loss of personal security, and severe emotional distress.

## COUNT V

### Invasion of Privacy — Public Disclosure of Private Facts
### (Against John/Jane Does #3–7, in their individual capacities)

212. Plaintiff realleges each preceding paragraph as if fully rewritten herein.

213. John/Jane Does #3–7 gave publicity to Plaintiff's identity as the victim of a 1994 home-invasion rape.

214. That matter concerned Plaintiff's private life.

215. The disclosure would be highly offensive to a reasonable person of ordinary sensibilities.

216. The matter was not of legitimate concern to the public.

217. The disclosure served no law-enforcement or governmental purpose.

218. John/Jane Does #3–7 acted with malicious purpose, in bad faith, or in a wanton or reckless manner.

219. As a direct and proximate result, Plaintiff suffered severe emotional distress.

220. As a direct and proximate result of Defendants' actions, Plaintiff suffered re-traumatization and loss of security.

## COUNT VI

### Intentional Infliction of Emotional Distress
### (Against John Does #1–2 and John/Jane Does #3–7, in their individual capacities)

221. Plaintiff realleges each preceding paragraph as if fully rewritten herein.

222. John Doe #1 fabricated a record portraying Plaintiff as complicit in her own rape.

223. John Doe #2 perpetuated that fabrication in the investigative file and case record.

224. John/Jane Does #3–7 publicly exposed Plaintiff's identity as a rape victim while her assailant remained at liberty.

225. Fabricating a record portraying a rape victim as complicit in her own assault is extreme and outrageous conduct.

226. Publicly exposing a rape victim's identity while her assailant remains at liberty is extreme and outrageous conduct.

227. This conduct exceeds all bounds of decency tolerated in a civilized community.

228. These Defendants acted with intent to cause, or in reckless disregard of the probability of causing, severe emotional distress.

229. These Defendants acted with malicious purpose, in bad faith, or in a wanton or reckless manner.

230. As a direct and proximate result of Defendants' actions, Plaintiff suffered severe emotional distress.

## COUNT VII

### (Civil Action for a Criminal Act — R.C. 2307.60
### (Against Anthony Shinaul)

231. Plaintiff realleges each preceding paragraph as if fully rewritten herein.

232. Shinaul committed rape against Plaintiff in violation of R.C. 2907.02.

233. Shinaul committed kidnapping against Plaintiff in violation of R.C. 2905.01.

234. Shinaul committed aggravated burglary against Plaintiff in violation of R.C. 2911.11.

235. Plaintiff was directly and proximately injured by those criminal acts.

236. Plaintiff suffered physical injury as a result of those criminal acts.

237. Plaintiff suffered severe emotional distress as a result of those criminal acts.

238. Plaintiff could not, in the exercise of reasonable diligence, have discovered Shinaul's identity until approximately June 2024.

239. Plaintiff's claim against Shinaul did not accrue until that date.

## COUNT VIII

### Intentional Infliction of Emotional Distress
### (Against Anthony Shinaul)

240. Plaintiff realleges each preceding paragraph as if fully rewritten herein.

241. Shinaul broke into Plaintiff's home.

242. Shinaul raped Plaintiff in the presence of her infant child.

243. That conduct was extreme and outrageous.

244. That conduct exceeds all bounds of decency tolerated in a civilized community.

245. Shinaul intended to cause, or acted in reckless disregard of the probability of causing, severe emotional distress.

246. As a direct and proximate result, Plaintiff has suffered and continues to suffer severe emotional distress.

247. Plaintiff could not, in the exercise of reasonable diligence, have discovered Shinaul's identity until approximately June 2024.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendants and award:

A. Compensatory damages in an amount to be determined at trial;

B. Punitive damages where authorized by law;

C. Attorney's fees and costs under 42 U.S.C. § 1988 and other applicable law;

D. Pre- and post-judgment interest; and

E. Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

*/s/ Bradley N. Jeckering*
Bradley N. Jeckering (0092299)
Kristie A. Campbell (0075855)
Patrick M. Quinn (0081692)
Taylor V. Fairbanks (0104817)
**JECKERING & ASSOCIATES, LLC**

10 North High Street, Suite 301
Columbus, OH 43215
Telephone: (614) 944-5151
brad@centralohiolegal.com
*Counsel for Plaintiff*

OA532 - M64

Franklin County Ohio Court of Appeals Clerk of Courts- 2025 Oct 28 10:46 AM-25AP000868

**IN THE COURT OF COMMON PLEAS, FRANKLIN COUNTY, OHIO**
**GENERAL DIVISION, CRIMINAL BRANCH**

| | | |
|---|---|---|
| **STATE OF OHIO** | : | |
| | : | **CASE NO:**  **13CR-6582** |
| **PLAINTIFF,** | : | |
| | : | |
| **vs.** | : | |
| | : | **JUDGE: CHRIS M. BROWN** |
| **ANTHONY SHINAUL,** | : | |
| | : | |
| **DEFENDANT.** | : | |

---

**DECISION AND ENTRY**
**GRANTING DEFENDANT'S MOTION TO DISMISS THE INDICTMENT**

This matter comes before the Court on the Defendant Anthony Shinaul ("Defendant")'s Motion to Dismiss Indictment, filed March 5, 2025. The State of Ohio filed a Memo Contra on March 24, 2025. Defendant filed a Supplemental Memo in Support on July 22, 2025. The Court held an evidentiary hearing on July 25, 2025. After the hearing, the Court invited the Parties to submit post-hearing briefings, which were filed on August 22 and August 25, 2025, respectively.

The Court has considered the briefings and the testimony admitted at the hearing. For the following reasons, Defendant's Motion to Dismiss the Indictment is hereby **GRANTED**.

**I.     PROCEDURAL HISTORY AND HEARING TESTIMONY**

On December 17, 2013, the Franklin County Grand Jury returned an indictment against an unknown individual using DNA identifiers from the Ohio Bureau of Criminal Identification and Investigation ("BCI") Lab Number 08-11157, Agency Case Number 50415-94. The Indictment charged the unidentified individual with one count of Aggravated Burglary, in violation of R.C. 2911.11, Kidnapping, in violation of R.C. 2905.01, and three counts of Rape, in violation of R.C. 2907.02, all felonies of the first degree (F1). A warrant for "John Doe" was issued on January 7, 2014. The charges are alleged to have occurred on or about July 10, 1994 involving the victim

1

K.A. On June 11, 2024, the Indictment was amended to identify the defendant as Anthony Shinaul, DOB: 5/18/71, SSN ▮▮▮▮▮▮▮ h a local Franklin County address.

At the hearing, Defendant called Jerusha Johnson ("Johnson"), an investigator of ten years with the Franklin County Public Defender's Office ("FCPD"). Johnson testified she reviewed the original investigative file from the Columbus Division of Police ("CPD"). She testified the file was large with many handwritten notes. Johnson testified one of the notes referred to a tip from "Postman Gary" about witnessing a prowler in the area of the offense on July 13, 1994. Johnson attempted to obtain records from the Bexley post office about any employees named "Gary" in 1994, but received a letter stating "[d]ue to the U.S. Postal Service record retention policy no Employee Listing records are available dating back to 1994." (Def. Ex. 1). Johnson testified there were no other means available to locate "Postman Gary."

Johnson testified she attempted to locate James Straight ("Straight"), the original CPD detective handling the investigation in 1994. A Lexis Nexis search located an obituary indicating Straight died in 2012. (Def. Ex. 2). On cross-examination, Johnson testified she found no information tying the prowler to Defendant. Johnson testified to having previously worked for the Akron Community-Based Correctional Facility for four years prior to being employed with FCPD.

Defendant next called Todd Caudill ("Caudill"), Chief Investigator with FCPD. Caudill testified to twenty years' experience with FCPD, the past six as the head of investigations. Caudill testified he holds a degree in Criminology from Ohio State University. Caudill testified he searched for inactive CPD witnesses, including Straight and Jeff Henry ("Henry"). However, Caudill stated he had difficulty narrowing down the search for Henry.

Caudill then attempted to located Dr. Andrew Schneider ("Schneider"), the physician who examined K.A. Caudill performed a Lexis Nexis search, which narrowed down the possible

2

individuals to one person. Based on that result, Caudill contacted Mount Carmel East Hospital, who indicated there was insufficient information from 1994 to confirm Schneider's employment.

Caudill testified he was eventually able to locate an obituary for Schneider from Epstein Memorial Chapel, indicating Schneider passed away on April 24, 2006. (Def. Ex. 3). After verifying Schneider's death in 2006, Caudill was able to obtain Schneider's records from the State Medical Board of Ohio. (Def. Ex. 4). Caudill's review of the records showed Schneider had his medical license suspended in 1999 and 2006 for issues relating to personal drug abuse and sales of narcotics. On cross-examination, Caudill agreed the police file indicated the DNA profile was obtained from a pillowcase, not from a sexual assault examination. Caudill testified that in 1994 Henry was a CPD Crime Scene detective.

After the defense rested, the State of Ohio called Delbert Chapman ("Chapman"), a detective with over thirty-two years as a member of CPD. Chapman currently is assigned to the Homicide Case Review Unit, which reviews cold cases. Chapman also works on "genetic genealogist investigator" cases, which reviews cases for possible CODIS[1] matches.

Chapman reviewed the investigative file in this case, but he was not the investigating detective in 1994. The packet initially identified an individual named "Tony," a known neighbor of A.K. and listed as a possible suspect or person of interest. The file indicated "Tony" was married to an overweight woman, and that victim had drinks with "Tony" the night before she was assaulted. Chapman testified "Tony" lived in close proximity to the victim's residence. However, there was no testimony that "Tony" was identified, interviewed, or otherwise investigated by CPD.

Chapman testified that, based on his review of the case file, the victim completed a sexual assault examination and that semen was located on a pillow in the living room. Based on this, some

---

[1] Combined DNA Index System.

3

suspects were eliminated and in 2008 a DNA profile was generated from the recovered fluid. Chapman testified he was able to identify Defendant through a search of vital statistics and ultimately obtained a DNA sample from Defendant. Chapman compared Defendant's sample with the semen collected from the pillow, and the results indicated the DNA matched.

On cross-examination, Chapman agreed that in 1994 CPD knew the suspect was a muscular black male. Chapman stated a lab request on certain swabs was completed in 1994, and that some swabs were sent to the lab in 2008, but he was unsure from where the swabs were collected. Chapman stated the DNA profile came back "unknown" in 2008. Chapman stated a genetic genealogist reviewed the case in May 2024, which led to Defendant being linked to the DNA profile listed in the Indictment.

Chapman further testified that he was unaware if a neighborhood canvas was performed in 1994, and he was unsure what the policy was in 1994 regarding canvassing for witnesses or suspects.

## II.  LEGAL ANALYSIS

Defendant raises several grounds in support of his request for dismissal. Defendant asserts allowing the State to proceed violates the Statute of Limitations, as well as Constitutional bars against both pre- and post-indictment delay. The Court will discuss each basis in turn.

### A.  Statute of Limitations and Retroactivity

Ohio's Statute of Limitations is codified in R.C. 2901.13. Its purpose is "to discourage inefficient or dilatory law enforcement rather than to give offenders the chance to avoid criminal responsibility for their conduct." *State v. Martin*, 2015-Ohio-761, ¶ 12 (8th Dist.), citing *State v. Climaco, Climaco, Seminatore, Lefkowitz & Garofoli Co., L.P.A.*, 85 Ohio St.3d 582, 586 (1999). "'The rationale for limiting criminal prosecutions is that they should be based on reasonably fresh,

4

and therefore more trustworthy evidence.'" *Id.,* quoting the Ohio Legislative Service Commission comment to R.C. 2901.13 (citations omitted).

Beginning March 9, 1999, Ohio's Statute of Limitations has been amended several times, enlarging the period for which a prosecution may be commenced for serious violent offenses. See Sub.H.B. 49, 147 Ohio Laws, Part I, 299 (effective March 9, 1999). Prior to that date, the Statute of Limitations for the offenses of Aggravated Burglary, Kidnapping, and Rape was six (6) years. 1974 HB 511 (effective Jan. 1, 1974). See also *State v. Dycus,* 2005-Ohio-3990, ¶ 7 (10th Dist.). The 1999 amendment increased the time for commencement of prosecution to twenty (20) years for those offenses.

Since 1999, R.C. 2901.13 has been amended eleven additional times. Pertinent to the case at hand is the 2015 amendment, which increased the Statute of Limitations for Rape to twenty-five (25) years. Currently, R.C. 2901.13(A)(4) reads, in pertinent part, as follows: "Except as otherwise provided in divisions (D) to (L) of this section, a prosecution of a violation of section 2907.02…shall be barred unless it is commenced within twenty-five years after the offense is committed." (effective April 9, 2025). The 2015 amendment added sections (D)(1) through (D)(3) allowing an additional five (5) years for commencement of prosecution after a DNA record matches an identifiable person. 2015 Sub.H.B. 6 (effective July 16, 2015).

Regarding the retroactive application of these amendments, current Revised Code section 2901.13(L)(1) states, in pertinent part, as follows:

> The amendments to divisions (A) and (D) of this section that took effect on July 16, 2015, apply to a violation of section 2907.02…of the Revised Code committed on and after July 16, 2015, and apply to a violation of either of those sections committed prior to July 16, 2015, if prosecution for that violation was not barred under this section as it existed on the day prior to July 16, 2015.

5

Ohio's Tenth District Court of Appeals has held that the 1999 amendments did not violate the Retroactivity Clause of the Ohio Constitution because the legislature expressly intended the changes to the Statute of Limitations to apply retroactively and the changes were remedial in nature. See *Dycus*, supra, ¶¶ 8-16. Additionally, the *Dycus* Court held the amendments to R.C. 2901.13 did not violate the Ex Post Facto Clause of the United States Constitution. *Id.*, ¶¶ 17-21.

Under the Statute of Limitations, a prosecution commences "on the date an indictment is returned or an information is filed, or on the date a lawful arrest without a warrant is made, or on the date a warrant, summons, citation, or other process is issued, whichever occurs first." *R.C. 2901.13(F)*. However, "[a] prosecution is not commenced by the return of an indictment or the filing of an information unless reasonable diligence is exercised to issue and execute process on the same." *Id.* "'[A] prosecution is not commenced so as to toll the running of the statute of limitations merely by the issuance of a summons or warrant. It is commenced by the issuance of a summons or warrant plus the exercise of reasonable diligence to execute the same.'" *State v. Berry*, 2021-Ohio-2588, ¶ 36 (8th Dist.), citing *State v. Hawkins*, 2019-Ohio-5133, ¶ 15, quoting *State v. Morris*, 20 Ohio App.3d 321, 322 (10th Dist.1984).

The term "reasonable diligence" has been defined as "[a] fair, proper and due degree of care and activity, measured with reference to the particular circumstances; such diligence, care, or attention as might be expected from a man of ordinary prudence and activity.'" *Id.*, ¶ 37, quoting *Sizemore v. Smith*, 6 Ohio St.3d 330, 332 (1983). The State of Ohio has the burden to demonstrate "reasonable diligence" was used in cases where "a defendant is not identified until after the statute of limitations has expired." *State v. Moore*, 2022-Ohio-522, ¶ 40 (8th Dist.), citing *Hawkins*, supra, ¶ 11.

6

## B. Pre-Indictment Delay and Due Process

The Due Process Clause of the Fifth Amendment to the United States Constitution states, in pertinent part, as follows: "No person shall…be deprived of life, liberty, or property, without due process of law." The Fourteenth Amendment incorporated the Due Process Clause and its protections to the individual states. The term "Due Process" refers to "'fundamental conceptions of justice which lie at the base of our civil and political institutions'…and which define 'the community's sense of fair play and decency.'" *United States v. Lovasco*, 431 U.S. 783, 790, (1977), quoting *Mooney v. Holohan*, 294 U.S. 103, 112 (1935) and *Rochin v. California*, 342 U.S. 165, 173 (1952).

Regarding preindictment delay, the Ohio Supreme Court has held such delay violates Due Process only where "[a]n unjustifiable delay between the commission of an offense and a defendant's indictment thereof…results in actual prejudice to the defendant." *State v. Jones*, 2016-Ohio-5105, ¶ 12, quoting *State v. Luck*, 15 Ohio St.3d 150 (1984), paragraph two of the syllabus. As such, "the possibility of faded memories, unavailable witnesses, and lost or destroyed evidence does not, in and of itself, constitute actual prejudice." *State v. White*, 2017-Ohio-810, ¶ 72 (10th Dist.), citing *State v. Smith*, 2016-Ohio-7893, ¶ 19 (8th Dist.).

Trial courts must follow a burden-shifting approach in considering claims of preindictment delay. *Jones*, ¶¶ 15-16. "Once a defendant presents evidence of actual prejudice, the burden shifts to the state to produce evidence of a justifiable reason for the delay." *Id.*, ¶ 13, citing *State v. Whiting*, 84 Ohio St.3d 215, 217 (1998) and *State v. Adams*, 2015-Ohio-3954, ¶ 99. "[T]he primary safeguard against pre-indictment delay is the applicable statute of limitations." *Id.* ¶ 54, citing *State v. Carter*, 2007-Ohio-5259, ¶ 16 (5th Dist.).

7

## C. Post-Indictment Delay

Both the United States and Ohio Constitutions guarantee a defendant the right to a speedy trial. U.S. Constitution, 6th Amendment; Ohio Constitution, Article I, § 10. The underlying purposes of the Speedy Trial right have been stated thusly:

> The Sixth Amendment right to a speedy trial is not primarily intended to prevent prejudice to the defense caused by passage of time; that interest is protected primarily by the Due Process Clause and by statutes of limitations. The speedy trial guarantee is designed to minimize the possibility of lengthy incarceration prior to trial, to reduce the lesser, but nevertheless substantial, impairment of liberty imposed on an accused while released on bail, and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges.

*State v. Triplett*, 78 Ohio St.3d 566, 569 (1997), quoting *United States v. MacDonald*, 456 U.S. 1, 8 (1982).

The filing of an indictment gives rise to a defendant's right to a speedy trial. *U.S. v. Marion*, 404 U.S. 307, 313 (1971). In asserting a speedy trial violation, a defendant must first demonstrate a "presumptively prejudicial" delay before the court considers additional speedy trial delay factors. *State v. Sellers*, 2009-Ohio-2231 ¶ 14 (10th Dist.), citing *Doggett v. U.S.*, 505 U.S. 647 (1992) and *Barker v. Wingo*, 407 U.S. 514 (1972). A delay of one (1) year is considered presumptively prejudicial. *Doggett*, 652, fn. 1.

If the trial court finds the delay presumptively prejudicial, the second inquiry must consider:

1. The length of the delay;

2. The reason for the delay;

3. The defendant's assertion of his speedy trial right; and

4. The resulting prejudice to defendant.

*Doggett*, 651.

8

The length of the delay operates as a "triggering mechanism" that must be met before consideration of the remaining factors. *Triplett*, 569, citing *Barker*, 530. "Only the portion of the delay which is attributed to the government's neglect is to be weighed in a defendant's favor." *Id.* Where a defendant is made aware of the indictment, that factor generally "would weigh heavily" against him or her. *Id.*, 570. Regarding the fourth factor, prejudice to the defendant, in the post-indictment context, court "have to recognize that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." *Id.*, citing *Doggett*, 655. A lengthy delay is presumptively prejudicial, differentiating the post-indictment situation from *Luck*'s requirement that a defendant show actual prejudice caused by the government's pre-indictment delay.

## III.  FINDINGS AND CONCLUSION

As an initial matter, the Court finds the following timeline is supported by the briefings, evidence elicited at the evidentiary hearing, and the agreement of the Parties:

- Offense date:                                          July 10, 1994.

- Statute of Limitations runs (pre-amendment):          July 10, 2000.

- 1999 Statute of Limitations effective date:           March 9, 1999.

- Indictment date (John Doe):                           December 17, 2013.

- Warrant date:                                         January 7, 2014.

- Statute of Limitations runs (1999 amendment):         July 10, 2014.

- 2015 Statute of Limitations effective date:           July 16, 2015.

- Statute of Limitations runs (2015 amendment):         July 10, 2019 or 5 years after DNA match "determination is complete" per R.C. 2901.13(D)(1).

- Indictment amended (Defendant's identity):            June 11, 2024.

9

The Court first addresses the appropriate limitations period for commencement of prosecution in the instant matter. The Court finds the 1999 amendment applies to Defendant, because the alleged offense occurred within the six-year period before the effective date of the extended 20-year limitation period. Thus, the State had to commence prosecution on or before July 10, 2014. The Indictment was filed on December 17, 2013, within that 20-year time period.

However, based on this finding, the Court further finds the 2015 amendments extending the Statute of Limitations to twenty-five years and beyond are inapplicable in the instant matter. Under R.C. 2901.13(L)(1), the prosecution would have been barred as of July 10, 2014, nearly one year prior to the effective date (July 16, 2015) of the newer amendments. As such, the Court finds the provisions included in the 2015 amendment, including the 5-year savings statute under R.C. 2901.13(D), do not apply.

The next issue to consider is whether the Statute of Limitations was tolled after filing the Indictment. The Court finds the investigating officials made minimal efforts to identify A.K.'s assailant for nearly thirty (30) years, starting from the initial report in 1994 to generation of the DNA profile in 2008, the subsequent "John Doe" indictment in 2013, and finally the arrest of Defendant in 2024. The evidence at the hearing was devoid of any attempts to conduct any investigation after the initial report. The swabs collected from the scene were not submitted for analysis until 2008. And even then, once the DNA profile was created, an indictment was not sought until late 2013.

The evidence from the hearing showed that law enforcement had fresh information in 1994 that, if acted upon, could have developed Anthony Shinaul as a suspect near the time of the attack. A simple neighborhood canvas based on A.K.'s description of a muscular male black neighbor with an overweight wife named "Tony" would have potentially closed the investigation in weeks,

10

Franklin County Ohio Court of Appeals Clerk of Courts- 2025 Oct 28 10:46 AM-25AP000868

not decades. A DNA sample could have been obtained then, and a match could have been made in 1994, not 2024.

The Court finds the facts presented are similar to *Moore*, supra. In *Moore*, the victim alleged she was kidnapped and raped by a know assailant, but refused to identify the perpetrator. The offense occurred in 1995, and the victim underwent a sexual assault examination and evidence was placed in a rape kit. The rape kit was not tested until 2012. In 2014, the DNA from the rape kit was linked to a homicide investigation with an unknown male DNA profile. In 2018, the DNA collected from the rape kit was compared to Moore's known sample, and confirmed the presence of his DNA in the rape kit. *Moore*, 2022-Ohio-522, ¶¶ 2-8. The Eighth District held, as follows:

> "There is nothing in the record to suggest that the state used reasonable diligence to ascertain Moore's identity before the expiration of the statute-of-limitations. Further, after the John Doe-DNA indictment was filed, the state waited for a DNA match to identify Moore in 2018." *Id.*, ¶ 40.

Such is the case here. The investigators had identifying information in 1994 of a possible suspect. Instead of following up, there was no evidence of any attempt to locate, speak to Defendant, or obtain a comparison DNA sample from the neighbor "Tony." The DNA swabs collected from the pillow were not submitted until 2008. Even after a DNA profile was generated, the Indictment was not sought until five years after that, and then another 11 years lapsed before CPD attempted to use genealogy genetic testing. Evidence was in CPD's possession that "Tony" matched the description of the assailant. However, there is no evidence in the record that CPD made even a cursory attempt to locate this person in order to confirm the DNA recovered or to effectuate service of the warrant.

Taken as a whole, the Court finds the State did not use "reasonable diligence" under R.C. 2901.13(F) to investigate, identify, or otherwise commence prosecution in this case. Furthermore,

11

there is no evidence Defendant fled the state or purposely attempted to avoid prosecution for these offenses under R.C. 2901.13(H).

Regarding Defendant's claims of post-indictment delay, the Court finds a delay of nearly eleven (11) years from indictment to identifying Shinaul is presumptively prejudicial. The Court finds the length of the delay weighs in Defendant's favor. In considering the reason for the delay, the Court finds the delay was caused by the inaction of the investigating CPD officers. As stated above, CPD's failure to follow-up on a suspect named "Tony" matching the description of the assailant caused delay of over a decade. The third factor, Defendant's assertion of his speedy trial right, cannot be held against Defendant as the Indictment was in the name of "John Doe." One cannot assert a speedy trial right when one does not know he is under investigation much less indictment.

Finally, although Defendant has not demonstrated actual prejudice (see below), the prejudice to Defendant is presumed where trial commences over thirty (30) years after the alleged incident occurred. Memories have faded. At least three key witnesses are deceased. Those available to the State will almost certainly be testifying about an investigation conducted by others, lacking any firsthand knowledge of anything contained in the reports from 1994.

The Court is sympathetic to the backlog of unsolved cases handled by CPD, given the limited resources testified to by Chapman. The delay in the investigation is as unfair to A.K. as it is to Defendant. However, the laws of Ohio and our separate Constitutions do not permit a "crockpot" approach to criminal investigations: the government cannot "set it and forget it." Unfortunately, that is precisely what happened here when the State indicted "John Doe" and let the case sit for over a decade.

Lastly, the Court finds the Defendant did not demonstrate actual prejudice for purposes of his Due Process challenge resulting from pre-indictment delay. The information concerning "Postman Gary" seeing a prowler near the time of the attack is speculative. Even if "Postman Gary" was able to be located, it was not shown at the hearing that his seeing a prowler days before the attack would have provided reasonable doubt as a defense to these charges.

Furthermore, Schneider's sordid disciplinary history with the Ohio Medical Board may have cast some doubt on the credibility of his testimony. However, the DNA material was not recovered from the A.K.'s sexual assault examination performed by Schneider. Additionally, Defendant's concerns that Detectives Straight and Henry are unavailable due to death are speculative at best. The Court finds Defendant did not meet his initial burden to show actual prejudice resulting from pre-indictment delay. Furthermore, as stated above, the case was filed within the Statute of Limitations, even though R.C. 2901.13 was not tolled after the Indictment was issued.

For these reasons, the Court GRANTS Defendant's Motion to Dismiss on the grounds the Indictment violated R.C. 2901.13 and Defendant's Sixth Amendment Speedy Trial protections. The Court finds the Indictment did not violate the Due Process Clause of the Fifth and Fourteenth Amendments because of pre-indictment delay, and therefore DENIES the Motion to Dismiss on those grounds.

**SO ORDERED.**

**THE COURT FINDS THERE IS NO JUST CAUSE FOR DELAY. THIS IS A FINAL APPEALABLE ORDER.**

**THE COURT WILL MAINTAIN ALL EXHIBITS FOR PURPOSES OF APPEAL.**

/s/ Chris Brown (signature page attached)
Judge Chris Brown

13

**COPIES TO ALL COUNSEL VIA ELECTRONIC FILING**

Franklin County Ohio Court of Appeals Clerk of Courts- 2025 Oct 28 10:46 AM-25AP000868

Franklin County Ohio Clerk of Courts of the Common Pleas- 2025 Sep 29 8:38 AM-13CR006582

Franklin County Ohio Court of Appeals Clerk of Courts- 2025 Oct 28 10:46 AM-25AP000868

Franklin County Court of Common Pleas

**Date:** 09-29-2025

**Case Title:** STATE OF OHIO -VS- ANTHONY SHINAUL

**Case Number:** 13CR006582

**Type:** ENTRY/ORDER

It Is So Ordered.

/s/s Judge Christopher M. Brown

Electronically signed on 2025-09-29 08:38:27    page 15 of 15

Court Disposition

Case Number: 13CR006582

Case Style: STATE OF OHIO -VS- ANTHONY SHINAUL

Motion Tie Off Information:
1. Motion CMS Document Id: 13CR006582002████████980000
   Document Title: 07-03-2024-BOND HEARING - MOTION FOR -
   Disposition: MOTION RELEASED TO CLEAR DOCKET


2. Motion CMS Document Id: 13CR006582002████████980000
   Document Title: 03-05-2025-DISMISSAL - MOTION FOR -
   Disposition: MOTION GRANTED - CASE LEVEL


3. Motion CMS Document Id: 13CR006582002████████980000
   Document Title: 09-12-2024-MOTION FILED - - TO COMPEL
DISCOVERY
   Disposition: MOTION RELEASED TO CLEAR DOCKET


4. Motion CMS Document Id: 13CR006582002████████980000
   Document Title: 07-22-2025-MOTION FILED - - SUPPLEMENTAL
MEMORANDUM IN SUPPORT OF DE
   Disposition: MOTION RELEASED TO CLEAR DOCKET


5. Motion CMS Document Id: 13CR006582002████████980000
   Document Title: 08-25-2025-MOTION FILED - - BRIEF IN
SUPPORT OF DEFENDANT'S MOTION T
   Disposition: MOTION RELEASED TO CLEAR DOCKET

Franklin County Ohio Court of Appeals Clerk of Courts- 2025 Oct 28 10:46 AM-25AP000868

Franklin County Ohio Clerk of Courts of the Common Pleas- 2025 Sep 29 8:38 AM-13CR006582

Franklin County Ohio Court of Appeals Clerk of Courts- 2025 Oct 28 10:46 AM-25AP000868

EXHIBIT B



**Rachel** ›

iMessage
Jul 9, 2024 at 11:08 AM

Hi Kerry, it's Rachel Gangwer from from the prosecutors office. This is my new work number, so make sure to save it.

I was unexpectedly off so I apologize for my delay. Dan filed for a bond hearing that got scheduled for tomorrow morning because he wants the court to put him on an electronic monitoring device because he bonded out. We at least want to know where he is.

You do not need to be present but of course you can be if you want to be, it's completely up to you.

+ iMessage 🎤

Hi Rachel. Thank you for letting me know. I am traveling for work, but my sister may attend. I also contacted Sergeant McConnell because I have never heard from a victim advocate. Is that something you can help me with?

I'm the victim advocate 😊

What is your sister's name? I can look for her tomorrow?

We'll be in courtroom 3f of 345 south high street, just so she knows where to go

Oh perfect!!!! Thank you.



**Rachel** ›

Her name is Kim Miller. Is it at 9am?

Yes, scheduled for 9. Sometimes we're there waiting around for a bit so tell her to plan for that & probably not to park at a meter just in case.

👍

Ok, if she decides not to come then I will let you know.

Not a problem either way. I'll update you as soon as I can

💗



+ iMessage 🎤



**Rachel ›**

We do have a court date on Wednesday, but I do expect it to be continued and nothing happen in the court room, especially given the discovery

We have provided discovery to her as of today, so all good there. But I still expect a continuance Wednesday since they just got it. 😊 hope that helps. I'll touch base with you after court with any updates I get.

Ok. Thank you. Do you know why so delayed? It just bothers me he's out free.

Unfortunately it's the nature of the courthouse -

+    iMessage    🎤

 

Rachel ›



Unfortunately it's the nature of the courthouse - cases can take 6 months to a year to make any kind of progress. It would really bother me too that he's out, I'm sure it puts you on edge.

Once the defense attorney is able to sit down and go through the discovery & able to talk to him, I'm hoping that we'll get more of a sense or trial vs plea etc. We will never do anything without you, though.

Ok, thanks for the update. Please let me know what happens on Thursday.

Absolutely. Let me know if

+          iMessage                🎤

Absolutely. Let me know if anything else comes up before then, always here.

Sep 18, 2024 at 12:48 PM

Hi Kerry! It was continued today as we suspected, the defense attorney just got all of the discovery as I mentioned so she's going to start looking through everything. That's really my only update from this morning. I don't have the new date yet, but I'll let you know once I do.

I don't expect anything in the courtroom on the next date, but I'll let you know if that changes. And as always if there is any attempted contact from his end please let us

+        iMessage        🎤



**Rachel** ›

think will happen in a month?

Oct 22, 2024 at 12:56 PM

My best guess is another continuance, the defense attorney will need to continue to meet with anthony & discuss if he is willing to plead to anything or if he wants a trial.

I'll let you know if I hear anything before then

Ok. Thank you

Dec 13, 2024 at 7:31 AM

Hi Rachel, any updates from yesterday?

Dec 13, 2024 at 8:47 AM

iMessage



**Rachel** ›

Dec 13, 2024 at 7:31 AM

> Hi Rachel, any updates from yesterday?

Dec 13, 2024 at 8:47 AM

Hi Kerry! We were continued to a new date. The defense attorney is doing some research on the way the case was indicted, (since it was indicted as a dna profile and not a person), she's got to file some motions and she's still working on those.

We don't believe there's any legal issues with the case but she's got to do her part and file the motions.

Dec 17, 2024 at 9:29 AM

+ iMessage


Dec 17, 2024 at 9:29 AM

Good morning Kerry, our new court date is scheduled for 1/13. You don't need to be present unless you hear from us.

Thank you Rachel.

Jan 13, 2025 at 6:32 PM

Hi Rachel, any news from today?

Jan 14, 2025 at 10:02 AM

Good morning! Sorry about the delay, it was continued, the defense attorney is still working on the motions i told you about.

Wed, Mar 5 at 12:51 PM

+    iMessage



**Rachel ›**

Hi Rachel. Could I please get an update?

Mon, Mar 17 at 9:32 AM

Hi Kerry, good morning, I spoke with Dan. The defense attorney filed a motion to dismiss the case, due to the nature of how the indictment came about (it was indicted back in 2013 before the dna profile was known). We're set for a court date of April 7th to give Dan some time to file a response to the motion. I don't expect anything on 4/7, on that day they will make a date to argue the motions in front of the court.

How does Dan feel about

+        iMessage

 



He feels confident it will go our way

Ok, please let me know when the next date is after 4/7. I would also like to understand more about how he will argue this, does the defense get to counter again or will the judge just decide on these two motions, etc....

So they wrote a motion, we'll write a response. Then at the actual motion hearing they'll make oral arguments

You may want to attend the motion hearing? But it's completely up to you. Anthony will be there.


arguments

You may want to attend the motion hearing? But it's completely up to you. Anthony will be there.

Ok, that will be the date set after 4/7, correct?

That's my understanding, yes. 4/7 they'll pick the motion hearing date. So sometime in May is my guess

Ok, thank you. I may want to be there. I know this probably doesn't matter, but I will be out of town May 5-9. Please keep me posted.

Ok I'll make sure Dan

iMessage



**Rachel** ›

Thu, Apr 10 at 3:38 PM

They set the motion hearing for 5/22 at 1:30, it's completely up to you if you'd want to be present. Just let me know if you plan to so we can make a plan on where to meet

Fri, Apr 11 at 8:54 PM

Hi Rachel, can you tell me what happened at the last hearing and what to expect at the next one?

Mon, Apr 14 at 9:24 AM

Good morning, so at the last hearing it was just a continuance being signed & the judge said to schedule the motion hearing via email due to everyone's busy

+ iMessage


Good morning, so at the last hearing it was just a continuance being signed & the judge said to schedule the motion hearing via email due to everyone's busy schedules. So via email they set the 5/22 motion hearing date.

At the 5/22 date, it's at 1:30pm. The attorneys will enter oral arguments about their motions. Usually the court asks them to summarize their motions & hit the highlights of their arguments at that time. The judge may ask the attorneys direct questions about their arguments, as well.

+ iMessage



**Rachel** ›

Tue, May 20 at 3:26 AM

Hi Kerry, I hope that you're well. Unfortunately we believe our motion hearing is going to be continued from 5/22 to 6/5 - the defense asked for more time & the judge granted it

I wasn't sure if you planned to attend, but wanted to make sure you knew right away

Tue, May 20 at 2:00 PM

Ok thank you. Will you please let me know what time it will be.

Wed, May 28 at 2:31 PM

Oh jeez I just have mentally responded to this, I apologize! It's

+    iMessage




Wed, May 28 at 2:31 PM

Oh jeez I just have mentally responded to this, I apologize! It's scheduled for 1:30pm on 6/5

Dan is currently out of town but as soon as he's back Monday I'll confirm we're still going forward that day

Mon, Jun 2 at 4:18 PM

Hi Kerry, I just chatted with Dan about our motion hearing this week. He let me know it is getting continued again, the defense attorney wants to do more investigating into the doctor who performed the SANE.

+          iMessage